# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# DAVENPORT DIVISION

| | |
|---|---|
| DONALD F. NEIMAN, Trustee,<br><br>　　　　Plaintiff,<br>vs.<br><br>GREAT LAKES HIGHER EDUCATION CORPORATION,<br><br>　　　　Defendant. | No.  3:18-cv-1-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |

## *I.     INTRODUCTION*

This matter is before me on a motion (Doc. No. 23) for summary judgment filed by defendant Great Lakes Higher Education Corporation (Great Lakes).  Plaintiff Donald Neiman, as bankruptcy trustee for David and Dixie Harrison (David, Dixie, or the Harrisons), has filed a resistance (Doc. No. 34) and Great Lakes has replied (Doc. No. 40).  Oral argument is not necessary.  *See* N.D. Iowa L.R. 7(c).

## *II.     PROCEDURAL BACKGROUND*

On May 2, 2017, the Harrisons filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Iowa.  Doc. No. 1-2 at ¶ 25.  Neiman, the Chapter 7 trustee in the Harrisons' bankruptcy case, brought this action in the Iowa District Court for Washington County, Iowa, to reduce to money the property of the bankruptcy estate.  *Id*. at ¶¶ 27, 28.  This action arises from events involving the Harrisons' student loan debt.  The state court petition alleges that Great Lakes violated the Telephone Consumer Protection Act (47 U.S.C. § 227(b)(1)) (Count 2) and the Iowa Debt Collection Practices Act (Iowa Code § 537.7103) (Count 3).  The petition also

asserts claims based on the common law torts of intrusion upon privacy (Count 4) and negligence (Count 5).[1]

Invoking both federal question jurisdiction and diversity jurisdiction, Great Lakes removed the action to the United States District Court for the Southern District of Iowa on January 4, 2018. Doc. No. 1. Great Lakes then moved for summary judgment as to all claims on August 29, 2018. This case was transferred to me on October 15, 2018 and is currently scheduled for a jury trial beginning April 29, 2019.

### III.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts,"

---

[1] There is no "Count 1." Under the heading "Count 1," plaintiff lists a number of "common allegations" related to jurisdiction, venue and the parties. *See* Doc. No. 1-2 at ¶¶ 8-41.

*Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id.* If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77

(8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## IV.   RELEVANT FACTS

The following facts are undisputed:

### A.   *The Parties*

The Harrisons are residents of Washington, Iowa. Doc. No. 1-2 at ¶ 14. Dixie became a Licensed Practical Nurse (LPN) in 2001. *Id.* She took out student loans to attain an associate degree in nursing in 2006 but has not yet been successful in passing her Registered Nurse (RN) Boards. *Id.* In 2015, Dixie earned a bachelor's degree in Health Care Administration from Kaplan University. *Id.* Today, she works as an LPN at Halcyon House, a skilled nursing facility in Washington, Iowa. *Id.*

David attended Indian Hills Community College and earned several certificates in industrial maintenance with financing from student loans. *Id.* at ¶ 19. Although he has previously worked as an assistant store manager at Econofoods and a backroom manager at Walmart, his deteriorating health forced him to leave work in the summer of 2014. *Id.* David has applied for Social Security Disability. *Id.*

Great Lakes, which services the student loans at issue, is a Wisconsin Nonprofit Corporation with its principal place of business in Wisconsin. Doc. No. 1 at ¶ 5. Great Lakes is licensed to conduct business in Iowa. Doc. No. 3 at ¶ 9.

### B.   *The Loans*

Dixie funded her post-secondary education, at least in part, using student loans. Doc. No. 1-2 at ¶ 14. On June 8, 2006, Dixie signed a Federal Consolidation Loan Application and Promissory Note through the Federal Family Education Loan Program (FFELP). Doc. No. 23-2 at 41-44. Beginning on January 25, 2010, Dixie began requesting deferments on her FFELP loans.

Each of the deferment forms included a substantially identical "authorization:"

> I authorize the school, the lender, the guarantor, the Department, and their respective agents and contractors to contact me regarding my loan(s), including repayment of my loan(s) at the current or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or pre-recorded voice or text messages.

*See, e.g. id.* at 46 (January 2010 deferment request). Dixie provided a combination of three phone numbers on each of these forms:

| Deferment Request | Numbers Provided |
|---|---|
| Dixie January 2010 unemployment deferment | (XXX) XXX-3090; (XXX) XXX-0071 |
| Dixie June 2010 unemployment deferment | (XXX) XXX-3090 |
| Dixie January 2011 unemployment deferment | (XXX) XXX-3090; (XXX) XXX-0070 |
| Dixie March 2011 hardship deferment | (XXX) XXX-3090; (XXX) XXX-0071 |
| Dixie April 2012 in-school deferment | (XXX) XXX-3090; (XXX) XXX-0071 |

*Id.* at 46-49.

David also funded his post-secondary education using student loans. Doc. No. 1-2 at ¶ 19. On June 8, 2006, he executed a Federal Consolidation Loan Application and Promissory Note through the FFELP program. Doc. No. 23-2 at 50-53. Like Dixie, David submitted several deferment requests and provided three phone numbers:

| Deferment Request | Numbers Provided |
|---|---|
| David November 2009 hardship deferment | (XXX) XXX-3090 |
| David September 2010 hardship deferment | (XXX) XXX-3090; (XXX) XXX-0070 |
| David January 2011 hardship deferment | (XXX) XXX-3090; (XXX) XXX-0071 |

*Id.* at 54-56. David's deferment requests contained the same authorization as Dixie's:

> I authorize the school, the lender, the guarantor, the Department, and their respective agents and contractors to contact me regarding my loan(s), including repayment of my loan(s) at the current or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or pre-recorded voice or text messages.

5

*See, e.g. id.* at 54.

### C.   *Great Lake's Loan Collection Practices*

The Harrisons allege that they received daily harassing phone calls from Great Lakes from February 24, 2017 to April 25, 2017. Doc. No. 1-2 at ¶ 2. Great Lakes maintained an activity record for both Dixie and David during that time.[2]

Dixie's activity log along with the Storch declaration indicate that Dixie was contacted by phone at the following times:

| Date | Time | Notes |
| --- | --- | --- |
| January 20, 2017 | 10:22 a.m. | Answering machine – XXX-XXX-0071 – delinquency |
| January 24, 2017 | 10:53 a.m. | Dialer called – answering machine |
| January 30, 2017 | 12:28 p.m. | Dialer called – answering machine |
| February 2, 2017 | 10:52 a.m. | Dialer called – answering machine |
| February 7, 2017 | 9:20 a.m. | Dialer called – answering machine |
| February 13, 2017 | 4:22 p.m. | Dialer called – answering machine |
| February 16, 2017 | 9:03 a.m. | Dialer called – answering machine |
| February 21, 2017 | 9:44 a.m. | Dialer called – answering machine |
| February 24, 2017 | 4:00 p.m. | Borrower hung up, said does not have finances for account and to contact bankruptcy lawyer. |
| March 17, 2017 | 1:29 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| March 20, 2017 | 5:56 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| March 23, 2017 | 5:41 p.m. | Answering machine – XXX-XXX-0071 – delinquency |

---

[2] The activity records also indicate bills emailed and mailed to the Harrisons, credit bureau reports and program renewals in addition to phone calls to the Harrisons. The notes for each event are abbreviated; however, most of the abbreviations have obvious meanings, which I have included in the table. I have also converted the 24-hour time notations to a 12-hour format.

| March 27, 2017 | 12:08 p.m. | Dialer called – answering machine |
| March 28, 2017 | 12:27 p.m. | Answering machine – XXX-XXX-0071 |
| March 30, 2017 | 12:15 p.m. | Dialer called – answering machine |
| March 31, 2017 | 2:22 p.m. | Dialer called – answering machine |
| April 3, 2017 | 1:01 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| April 4, 2017 | 9:52 a.m. | Dialer called – answering machine |
| April 5, 2017 | 5:20 p.m. | Borrower spoke with collections agent at XXX-XXX-0071. |
| April 6, 2017 | 1:06 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| April 11, 2017 | 7:36 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| April 14, 2017 | 7:14 p.m. | Borrower upset that she keeps getting calls from us when she is in the process of bankruptcy |
| May 8, 2017 | 8:07 p.m. | Answering machine – XXX-XXX-0071 – delinquency |
| May 9, 2017 | 4:20 p.m. | Dialer called – answering machine |
| September 8, 2017 | 12:10 p.m. | Great Lakes received a call from Dixie from XXX-XXX-0071 |

Doc. No. 25 at 3-5, Doc. No. 46 at ¶¶ 5,7, 9, 11.

David's activity log along with the Storch declaration indicate that David was called at the following times:

| February 22, 2017 | 1:11 p.m. | Borrower (Dixie) spoke with collections agent at XXX-XXX-0071 |
| April 6, 2017 | 2:43 p.m. | Borrower spoke with collections agent at XXX-XXX-9068. |
| April 18, 2017 | 12:29 p.m. | XXX-XXX-9068 – delinquency |
| April 19, 2017 | 10:14 a.m. | Dialer called – no answer |
| April 20, 2017 | 10:40 a.m. | Borrower spoke with collections agent at XXX-XXX-9068 |
| April 21, 2017 | 2:50 p.m. | Dialer called – no answer |
| April 21, 2017 | 7:57 p.m. | XXX-XXX-9068 – delinquency |
| April 24, 2017 | 1:02 p.m. | Dialer called – answering machine |
| April 25, 2017 | 9:36 a.m. | Dialer called – no answer |
| April 25, 2017 | 2:25 p.m. | Answering machine – XXX-XXX-9068 – delinquency |

| April 26, 2017 | 8:15 p.m. | Dialer called – no answer |
| April 27, 2017 | 1:55 p.m. | Dialer called – answering machine |
| April 28, 2017 | 10:52 a.m. | Answering machine – XXX-XXX-9068 – delinquency |
| May 1, 2017 | 10:09 a.m. | Dialer called – no answer |
| May 2, 2017 | 8:12 p.m. | XXX-XXX-9068 – delinquency. Borrower (Dixie) spoke with collections agent. |
| May 3, 2017 | 9:47 a.m. | Dialer called – no answer |
| May 4, 2017 | 1:22 p.m. | Dialer called – no answer |

Doc. No. 25 at 6, Doc. No. 41-1 at ¶¶ 4, 6, 8, 10.

Assuming the log is complete (the Harrisons do not argue otherwise), Great Lakes called the Harrisons 41 times over a 110-day period (January 20 to May 9, 2017), and Dixie called Great Lakes once. The parties talked over the phone a total of eight times, including the time that Dixie called Great Lakes. Doc. No. 41-1 at ¶ 12. Dixie's activity log first indicates that the Harrisons were seeking bankruptcy on February 24, 2017. Doc. No. 25 at 5. However, according to this log, Great Lakes was unable to confirm the filing of a bankruptcy case until May 15, 2017.[3] At that point, the calls on Dixie's account stopped. *Id.* at 3. David's activity log indicates that Great Lakes became aware of the bankruptcy filing on May 10, 2017, and that no collection calls occurred after that date. *Id.* at 6. The purpose of the calls to the Harrisons was to collect repayment of their loans. *Id.* at 10.

The eight phone calls during which the Harrisons and Great Lakes spoke to each other were recorded and a transcript of each was prepared by a third party. Doc. No. 41-1 at ¶ 16; Doc. No. 41-3. In all of these calls, the collections agents identified that they were debt collectors and advised that the calls would be recorded. In each instance in which Dixie stated that she had an attorney or was in the process of filing for bankruptcy, the collections agent took down information about the bankruptcy and made

---

[3] The Chapter 7 Petition was actually docketed on May 2, 2017. *See Dixie Lorraine Harrison & David LeRoy Harrison*, 17-00847-als7 (Bankr. S.D. Iowa May 2, 2017).

8

a note in the file. In only one case did the caller fail to identify Great Lakes, although the caller did identify as a debt collector. Doc. No. 43-1 at 1. Finally, at no point did any of the collectors use a harassing language or even a loud tone of voice. The Harrisons allege that they were harassed by the repeated calls at the 0071 phone number, which they contend is a cell phone. Doc. No. 23-2 at 79.

## V.   DISCUSSION

Great Lakes contends it is entitled to summary judgment on Count 2 because (1) the Telephone Consumer Protection Act (TCPA) does not apply to federal loans and (2) because the undisputed facts show that it did not violate the TCPA. Great Lakes argues it is entitled to summary judgment on Counts 3 through 5 because the Higher Education Act (HEA) preempts the Iowa Debt Collection Practices Act (IDCPA) claims and the common law claims, and that the undisputed facts show that it did not violate state law. The Harrisons generally resist. I will consider each of Great Lakes' arguments.

### A.   *Count 2 – TCPA*

The Harrisons allege that Great Lakes violated the TCPA by calling them at the 0071 number after Great Lakes was instructed to instead contact the Harrisons' attorney. Doc. No. 1-2 at ¶¶ 42-44. In their brief, the Harrisons additionally argue that Great Lakes violated the regulations enacted to govern calls made to collect debts owed to the government under the TCPA with the number and frequency of the calls to their cell phone. Doc. No. 34 at 12. Great Lakes argues that it is entitled to summary judgment because the Harrisons' loans were guaranteed by the United States and, therefore, that calls made to collect these loans were exempt from the TCPA. Great Lakes further argues that the Harrisons consented to receiving the calls at the 0071 number with their multiple deferment requests and that they did not revoke this consent.

The TCPA provides that:

It shall be unlawful for any person within the United States . . .

9

> (A)   to make any call (other than a call . . . made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> \*\*\*
>
> (iii)   to any telephone number assigned to a paging service, cellular telephone service . . . or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.
>
> (B)   to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call . . . is made solely pursuant to the collection of a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b). The purpose of the TCPA is to protect against "the harms inherent in the receipt of automated calls, in particular the invasion of privacy and the intrusion upon seclusion." *Ung v. Universal. Acceptance Corp.*, 198 F.Supp.3d 1036, 1037 (D. Minn. 2016). The Act was initially enacted without the exemption for debts owed to or guaranteed by the United States. However, Congress added that exemption in 2015. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (2015).

The 2015 Budget Act further required the Federal Communications Commission (FCC) to "prescribe regulations to implement the amendments" to the TCPA. 129 Stat. at 588. The FCC did so in 2016, publishing a Report and Order in response to Congress "authorizing the Commission to adopt rules to 'restrict or limit the number and duration' of any wireless calls 'to collect a debt owed to or guaranteed by the United States.'" 31 F.C.C.R. 9074, 9074-75 (2016). The FCC defined a debt "owed to or guaranteed by the United States" as follows:

> We determine that, for TCPA purposes, this phrase includes only debts for which the United States is currently the owner or guarantor of the debt. . .
>
> We clarify that the debt must be *currently* owed to or guaranteed *by the federal government* at the time the call is made. Debts that have been satisfied are not among the covered debts, and debts that have been sold in their entirety by the federal government are, likewise, not covered. In these

10

> cases, the debt is no longer "owed to. . . the United States." We note that basic contract principles dictate that when an owner sells an item, it no longer belongs to the original owner, but to the purchaser. Likewise, the purchaser of a debt is owed the repayment obligation, not the prior oblige. For example, a debt is not still "owed to . . . the United States" if the right to repayment is transferred in whole to anyone other than the Untied States, or a collection agency that has acquired ownership of the debt from the federal government collects the funds and then remits to the federal government a percentage of the amount collected. In such circumstances, the debt is no longer owed to the United States and our rules permit no calls under this exception.

*Id*. at 9082-83, ¶¶ 19-20. The regulations specifically exclude debts "insured" by the United States. *Id*. at 9082 n.54.

Finally, the regulations place limits on automated calls to cell phones even for debts owed to or guaranteed by the United States:

> A telephone call made using an autodialer or a prerecorded or artificial voice "to collect a debt owed to or guaranteed by the United States" must comply with the following limits on the number and duration of such calls:
>
> (1) The maximum number of telephone calls that may be made to a debtor is:
>
>     (A) three telephone calls within a thirty-day period, and
>
>     (B) zero telephone calls following a request by the debtor for no further calls.
>
>                                ***
>
> (5) No telephone calls shall be made before 8:00 a.m. or after 9:00 p.m. local time at the debtor's location.
>
>                                ***
>
> (7) No calls are permitted except to the debtor at:
>
>     (A) the wireless telephone number the debtor provided at the time the debt was incurred,
>
>     (B) a wireless telephone number subsequently provided by the debtor to the owner of the debt or the owner's contractor, or

>    (C)  a wireless telephone number the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number.
>
> (8) No calls are permitted except:
>
>    (A)  during a time period when a delinquency exists, or
>
>    (B)  following the end of a grace, deferment, or forbearance period; expiration of an alternative payment arrangement; or occurrence of a similar time-sensitive event or deadline affecting the amount or timing of payments due, and in the 30 days before such an event.

*Id.* at 9104-05 (Appx. A). The limitations placed on calls to collect debts owed to or guaranteed by the United States do not apply where the caller has obtained the prior express consent of the debtor. *Id.* at 9090-91, ¶¶ 36-38.

The parties dispute whether the FFELP consolidated loans are loans "currently owed to or guaranteed by the United States" and whether the collections calls are subject to either the TCPA or the regulations. However, the distinction between the TCPA and the regulations in this case is academic. The only violation of the TCPA the Harrisons alleged in their complaint is that Great Lakes continued calling after they revoked their consent. Because a creditor – whether collecting a debt owed to or guaranteed by the United States or otherwise – can call a debtor's cell phone as often as it likes provided it has the prior express consent of the debtor, the only issue in this case is whether the Harrisons validly revoked their consent.

Although the TCPA is silent as to revocation of consent, numerous courts have held that consumers may revoke their prior express consent. *See, e.g., Van Patten v. Vertical Fitness Grp., LLC,*, 847 F.3d 1047 (9th Cir. 2017); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014); *Gager v. Dell Fin. Srvs.*, LLC, 727 F.3d 265 (3d Cir. 2013). The FCC has also ruled that the TCPA permits a consumer to revoke his or her consent to receive covered calls "at any time and through any reasonable means." 30 F.C.C.R. 7961, 7996 ¶ 62 (2015). The United States Court of Appeals for

12

the District of Columbia recently upheld the FCC's rulemaking with respect to revoking consent. *ACA Int'l v. FCC*, 885 F.3d 687, 709 (D.C. Cir. 2018). The Eighth Circuit Court of Appeals has not yet addressed whether a consumer may revoke consent to receive covered calls under the TCPA. However, it has at least suggested its likely agreement with those circuits that have so held. *See, e.g., Brenner v. Am. Educ. Srvs.*, 575 Fed. Appx. 703 (8th Cir. 2014) (remanding for the district court to consider whether plaintiff's contention that he revoked consent precluded summary judgment).

The FCC regulations state that consent may be revoked in "any manner that clearly expresses a desire not to receive further messages." 30 F.C.C.R. at ¶ 63. Further, consumers "may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities." *Id.* at ¶ 64. The only requirement of the revocation is that it be express and clear.

As discussed above, the Harrisons and various Great Lakes representatives spoke a total of eight times:

1.   On February 22, 2017, Dixie verified her address and date of birth. She then stated, "And before you can go any further, all that you can – I'm going to give you a name of a lawyer. You can write – call him, and he will discuss everything with you." Doc. No. 41-3 at 2. Dixie did not ask Great Lakes to stop calling.

2.   On February 24, 2017, Dixie spoke with the representative regarding her ability to make a payment and the fact that she was attempting to work with a lawyer to file for bankruptcy. *Id.* at 4-9. Dixie verified her email address and the 0071 phone number. *Id.* at 10. She did not ask Great Lakes to stop calling. *Id.*

3.   On March 2, 2017, Dixie informed the caller that she would not be able to make a payment and shared her lawyer's contact information, and the representative added it to her account. *Id.* at 14-15. Dixie did not ask Great Lakes to stop calling. *Id.*

4.   On April 5, 2017, Dixie expressed frustration with the calls: "[E]very time you guys call me, I tell my lawyer and then they're going – he's going to turn around

and sue you for calling me and harassing me." *Id*. at 16. Dixie informed the callers that they would be filing for bankruptcy that week (they did not). *Id*. at 17. She verified her address and phone number and did not ask Great Lakes to stop calling. *Id*. at 20.

5. On April 6, 2017, Dixie informed the caller that "all my finances [are] currently under a lawyer's care right now." *Id*. at 22. When asked if she could make a payment that day, Dixie said, "I can't put anything against it today. You guys will have to contact my lawyer." *Id*. at 23. Dixie again provided her lawyer's contact information and confirmed the 0071 number. *Id*. She did not ask Great Lakes to stop calling. *Id*.

6. On April 14, 2017, an unknown speaker took a message from Great Lakes. The speaker did not ask Great Lakes to stop calling the Harrisons. *Id*. at 25.

7. On April 20, 2017, David briefly listened to a phone call from Great Lakes before hanging up. *Id*. at 26. David did not ask Great Lakes to stop calling. *Id*. at 26.

8. On September 8, 2017, Dixie called Great Lakes with some questions about the status of her loans post-filing for bankruptcy. *Id*. at 27. During this call, Dixie did not ask Great Lakes to stop calling her. Indeed, Great Lakes had not called her or David at all once their bankruptcy filing was confirmed. *Id*. at 28.

In light of these transcripts, the Harrisons have failed to generate a fact issue on whether they revoked their consent. Even under the forgiving revocation standard set out by the FCC, the Harrisons never asked Great Lakes to stop calling them. At best, they complained about the frequency of their calls and told Great Lakes to talk to their lawyer. However, in the absence of a clear and express revocation, there is no violation of the TCPA. Great Lakes is entitled to summary judgment on Count 2.

### B. *Count 3 – IDCPA*

The Harrisons allege that Great Lakes committed the following violations of the IDCPA:

    A.    A debt collector shall not oppress, harass, or abuse any person in connection with the collection or attempted collection of a debt of that person or another person.

    B.    A debt collector may not place telephone calls to the debtor without disclosure of the name of the business or company the debt collector represents.

    C.    A debt collector cannot cause a telephone to ring or engage a person in telephone conversation repeatedly or continuously or at unusual hours or times known to be inconvenient, with intent to annoy, harass or threaten a person.

    D.    A debt collector shall not use a fraudulent, deceptive or misleading representation or means to collect or attempt to collect a debt, including the use of a business, company or organization name, other than the true name of the debt collector's business.

    E.    A debt collector shall not contact the debtor when the debt collector knows an attorney represents the debtor.

Doc. No. 1-2 at ¶ 47 (citing Iowa Code § 537.7103). Great Lakes argues that the IDCPA is preempted by the Higher Education Act (HEA), as amended at 20 U.S.C. § 1071 et seq.

    The HEA (of which the above-discussed FFELP is a part) was enacted in 1965 "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329. Along with creating several financial aid programs, the HEA authorized the Secretary of the Department of Education (the Secretary) to protect the government's financial interest in these programs by establishing due diligence requirements in collecting HEA loans. *See* 20 U.S.C. § 1082(a) (directing the Secretary to "prescribe such regulations as may be necessary to carry out the purposes" of the HEA); 34 C.F.R. § 682.411(a) ("In the event of delinquency on an FFEL Program loan, the lender must engage in at least the collection efforts described in paragraphs (c) through (n) of this section . . ."); 55 Fed. Reg. 40120-01, 40120 (Dep't of Educ. 1990) ("The Secretary expressly promulgated these rules in order to establish the 'minimal level of effort

necessary to protect the Federal fiscal interest in diligent loan collection.'"). These due diligence regulations apply to contractors like Great Lakes, which are authorized by the Secretary to service federally guaranteed student loans.

The Eighth Circuit has explained the standards for determining whether federal law preempts state law:

> The preemption doctrine derives from the Constitution's supremacy clause, which states that laws of the United States made pursuant to the Constitution are the "supreme Law of the Land." U.S. Const. Art. VI, cl. 2. State laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid, or preempted. Congressional intent is the touchstone for determining the preemptive effect of a statute. Courts discern an intent to preempt state law when Congress expressly forbids state regulation (express preemption), when it creates a scheme of federal regulation so pervasive that the only reasonable inference is that it meant to displace the states (field preemption), and when a law enacted by it directly conflicts with state law (conflict preemption). With an exception not relevant to this case, preemption is an affirmative defense.

*Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005) (cleaned up). When preemption is based on a federal regulation, courts "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted). "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.*

The HEA regulations contain an express preemption provision:

> (o)   Preemption. The provisions of this section—
>
>    (1)   Preempt any State law, including State statutes, regulations, or rules, that would conflict with or hinder satisfaction of the requirements or frustrate the purposes of this section[.]

34 C.F.R. at § 682.411(o). The Secretary has further explained the scope of the preemptive provision:

> These provisions comprehensively regulate the pre-litigation informal collection activity on [Guaranteed Student Loan (GSL or GSLP)] obligations, by specifically requiring holders to complete a sequence of collection contacts with debtors. These provisions therefore preempt State law that would prohibit, restrict, or impose burdens on the completion of that sequence of contacts either on GSLP loans in general, or on any category of GSLP loans. Moreover, because holders of GSLP loans commonly engage servicers and collection agencies to perform these dunning activities, this preemption includes any State law that would hinder or prohibit any activity taken by these third parties to complete these required steps.

55 Fed. Reg. at 40121 (internal citations omitted).

The Eighth Circuit has not yet addressed whether the HEA preempts the IDCPA or any other state's debt collection practices act. However, other courts (including the Iowa Supreme Court) have held that the HEA's preemption provision means exactly what it says. If a state statute conflicts with the collection requirements under 34 C.F.R. § 682.411(a), the state statute is preempted. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996) ("The GSL regulations preempt 'State law that would prohibit, restrict, or impose burdens' on the sequence of pre-litigation contacts required by the GSL regulations . . . Because the Oregon UDCPA consists of nothing but prohibitions, restrictions and burdens on collection activity, it is preempted."); *Fischer v. UNIPAC Srv. Corp.*, 519 N.W.2d 793, 798-99 (Iowa 1994) ("Because the federal regulations in this area clearly conflict with restrictions on debt collection efforts under Iowa law, we believe state law is pre-empted to the extent it is inconsistent.").[4]

---

[4] Although some courts have held that specific *provisions* of state debt collection acts are not preempted, they reached that conclusion using a provision-by-provision analysis to determine whether the debtor's particular claims were preempted by the HEA. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015) (finding state law breach of contract claim did not conflict with or hinder satisfaction of regulations); *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 113, 1129 (11th Cir. 2004) (rejecting preemption of an "*entire* statute . . . because *some* of its provisions may actually conflict with federal law." (emphasis added)).

The Ninth Circuit explained the necessity of preemption with regard to collecting federal loans:

> The Secretary's implementation of congressional intent is not arbitrary, capricious, or manifestly contrary to statute. The Secretary's regulations and interpretation ensure that loan collectors will be governed by one uniform standard for pre-litigation loan collection. If student loan guarantors were exposed to liability under fifty different sets of statutes, regulations and case law, conducting diligent pre-litigation collection activity could be an extremely uncertain and risky enterprise. Exposure to liability under state law would provide a significant disincentive to pursue loan collection, and the cost advantages gained by concentrating GSL loan collection in a centrally-administered system would be lost. Preemption does deprive some defaulters of the ability to receive damages under state law; however, the congressional purpose in enacting the HEA was not to make it easier for defaulters to get money from loan collectors, but to protect the millions of students who would suffer irremediable loss if Congress had to shut down the GSL program.

*Brannan*, 94 F.3d at 1264-65. Further, the Ninth Circuit pointed out that debtors still enjoy significant protections from harassing debt collectors under federal law. *Id*. at 1266 (citing 55 Fed. Reg. at 41021).

In the absence of controlling Eighth Circuit authority on this issue, I find the reasoning of *Fischer* and *Brannan* persuasive. The IDCPA creates a conflict with the due diligence requirements under the HEA such that the Harrisons' claims under the IDCPA are preempted. Great Lakes is entitled to summary judgment on Count 3.

### C. *Count 4 – Intrusion upon Privacy*

The Harrisons allege that Great Lakes committed the common-law tort of intrusion upon privacy under *Koeppel v. Spears*, 808 N.W.2d. 177 (Iowa 2011), because "[o]nce [the] Harrison[s] informed Great Lakes that an attorney represented [them], then each subsequent Great Lakes call to [their] cell phone constituted a highly offensive intrusion into [their] personal affairs." Doc. No. 1-2 at ¶¶ 50-52. The Harrisons contend that they did not consent to the subsequent calls and that Great Lakes had "no privilege to

communicate directly with either of them." *Id.* at ¶ 53. Great Lakes argues that this claim is preempted both by the HEA and by the IDCPA, and that it is entitled to summary judgment on the merits because no reasonable jury could find in the Harrisons' favor.

Regarding preemption, there is little support for the authority that either the HEA or IDCPA preempt all common law tort claims. However, this claim may be disposed of on the merits. The basis of the Harrisons' claim is that they did not consent to the calls and that Great Lakes had no privilege to so contact them. As discussed above, the opposite is true: the Harrisons consented to receiving calls on their cellphone and they did not withdraw that consent. As a result, Great Lakes was privileged to call the Harrisons under federal law and did not intrude upon their privacy by doing so. Great Lakes is entitled to summary judgment on this count.

### D. Count 5 – Negligence

For their last count against Great Lakes, the Harrisons list a jumble of causes of action related to negligence:

> Great Lakes' outrageous, abusive and intrusive acts as described herein constitute negligence. Great Lakes negligently inflicted emotional distress. Great Lakes breached a duty imposed by law and contract. Great Lakes owe[d] [the Harrisons] a duty to refrain from unlawful debt collections and unlawful telephone contact. The breach of such duty proximately caused injury to [the Harrisons]. The injury resulted from an occurrence of which these statutes were designed to protect.

Doc. No. 1-2 at ¶ 58. The Harrisons appear to be stating claims for negligence per se (violation of Iowa Code chapter 708.7), common law negligence, breach of contract and negligent infliction of emotional distress. *Id.* at ¶¶ 58-66. They further argue that Great Lakes is liable for the actions of its employees under a theory of respondeat superior. *Id.* at ¶¶ 67-70. Finally, the Harrisons allege that Great Lakes acted with "oppression, and or malice," entitling the Harrisons to punitive damages. The Harrisons' did not make

this jumbled complaint clearer through their briefing, which did not even address Great Lakes' request for summary judgment on Count 5.

Due to the absence of any argument against the entry of summary judgment on Count 5, and the lack of any clear basis upon which to evaluate the Harrisons' negligence claims, I find that Great Lakes is entitled to summary judgment on Count 5.

## *VI.    CONCLUSION*

For the foregoing reasons, Great Lakes' motion (Doc. No. 23) for summary judgment is **granted** in its entirety.  Because this order disposes of all pending claims:

1. Judgment **shall enter** in favor of the defendant and against the plaintiffs.
2. The settlement conference scheduled to take place with Judge Mahoney on January 16, 2019, is hereby **cancelled**.
3. The trial of this action, currently scheduled to begin April 29, 2019, is hereby **cancelled**.
4. The Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 3rd day of December, 2018.

_____
Leonard T. Strand, Chief Judge